IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| ALEXANDER H. BRADLEY, JR., | ) Civil Action No. 3:08-2510-JFA-JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| SOUTH CAROLINA DEPARTMENT OF | ) **REPORT AND RECOMMENDATION** |
| CORRECTIONS; | ) |
| JOHN OZMIT; | ) |
| MAJOR MARK PRICE; AND | ) |
| A. J. PADULA, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff, Alexander H. Bradley, Jr. ("Bradley") filed this action pro se on July 11, 2008.[1]  He

subsequently obtained counsel and filed an amended complaint on October 30, 2008.  Defendants

are the South Carolina Department of Corrections ("SCDC") and SCDC employees Director John

Ozmint ("Ozmint"), Major Mark Price ("Price") and Lee Correctional Institution ("LCI") Warden

A. J. Padula ("Padula").  Bradley alleges claims under 42 U.S.C. § 1981 ("§ 1981), 42 U.S.C. § 1983

("§ 1983"), and South Carolina law.  On July 27, 2009, Defendants filed a motion for summary

judgment.  Plaintiff filed a memorandum in opposition on August 24, 2009, and Defendants filed a

reply on August 31, 2009.

## SUMMARY JUDGMENT STANDARD

When no genuine issue of any material fact exists, summary judgment is appropriate.  Shealy

v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  The facts and inferences to be drawn from the

---

[1]Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(e) DSC.  Because this is a dispositive motion, this report and recommendation is entered for review by the court.

evidence must be viewed in the light most favorable to the non-moving party. Id. Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits (see Fed. R. Civ. P. 56(e)), depositions, interrogatories, or admissions to demonstrate the

existence of a genuine and material factual issue for trial. <u>Baber</u>, citing <u>Celotex Corp.</u>, <u>supra</u>. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." <u>Mitchell v. Data Gen. Corp.</u>, 12 F.3d 1310, 1316 (4th Cir. 1993) and <u>DeLeon v. St. Joseph Hospital, Inc.</u>, 871 F.2d 1229, 1233 (4th Cir. 1989), n.7. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. <u>Martin v. John W. Stone Oil Distrib., Inc.</u>, 819 F.2d 547 (5th Cir. 1987) and <u>Evans v. Technologies Applications & Servs. Co.</u>, 80 F.3d 954 (4th Cir. 1996).

## **FACTS**

1. Bradley is an African-American male who began employment at SCDC as a correctional officer at LCI in approximately February 2001. In June 2001, he resigned to accept other employment. In November 2001, Bradley was rehired at SCDC as a correctional officer at LCI. Plaintiff's Dep. 13-14, 16, 19, 21; Amended Complaint ("AC"), Para. 11..

2. From November 2001 until February 2004, Plaintiff worked in the Special Management Unit ("SMU") of LCI. In February 2004, Bradley was transferred to the general population or "yard" area of LCI.[2] Plaintiff's Dep. 21-22.

3. In April 2006, Warden Anthony Padula ("Padula"), a white male, promoted Bradley to Corporal. Bradley was transferred back to the SMU. Plaintiff's Dep. 22-23.[3]

---

[2]In his opposition memorandum, Bradley asserts that the length of his time in the SMU (over eighteen months) was a violation of SCDC policy. He has not provided a copy of the policy or anything other than his own opinion to support this. Further, there is no indication that such a claim was made in his amended complaint.

[3]In his opposition memorandum, Bradley assets that white officers and female employees were promoted prior to him (that he was "passed over for promotion"). He has, however, provided nothing to support his claim other than his own opinion. In his deposition, Bradley did not provide the names

(continued...)

4.      On May 18, 2006, inmate McGahee threw a liquid substance, which Bradley believed to be urine and feces, at Plaintiff. Plaintiff's Dep. 40-41.

5.      Bradley informed the SCDC Investigation Office about the incident. He admits that it is up to the investigator to decide whether or not to move forward with criminal prosecution. SCDC Investigator Karen Hair ("Hair") declined to prosecute McGahee. Major Price and officials at SCDC headquarters refused Bradley's requests to have inmate McGahee prosecuted. Plaintiff's Dep. 43-44.

6.      Hair states that she did not bring criminal charges against McGahee because Bradley admitted that he approached McGahee in an incorrect manner.[4] Inmate McGahee was administratively punished with phone restriction, visitation suspension, and canteen suspension for 180 days, disciplinary detention for 90 days, and loss of 6 days of good-time credits. Hair Aff., Paras. 4-6 and Attachments A and B.

7.      In May 2006 (shortly after the McGahee incident), Bradley took leave pursuant to the Family Medical Leave Act ("FMLA") due to his mother's illness. Plaintiff's Dep. 26.

8.      On June 23, 2006, while on FMLA leave, Plaintiff went to Lee County Magistrate Woodham's office to press criminal charges against inmate McGahee. Magistrate Woodham informed Bradley that it was Investigator Hair's (not Bradley's) decision whether to prosecute. Plaintiff's Dep. 26, 42.

---

[3](...continued)
of the promoted white employees. See Plaintiff's Dep. 29, 32-33, 35-36, 120, 122.

[4]Bradley denies that he told Hair he approached McGahee's cell in an incorrect manner. In support of this he cites his own unsigned affidavit (Exhibit 1) and Exhibit 2 to his opposition memorandum. Exhibit 2 (in which Bradley admitted he did not follow policy with an inmate) concerns a February 2005 incident.

9.   Hair states that Magistrate Woodham contacted her about Bradley's actions.  She asked Major Price to consider taking corrective action against Bradley for violating SCDC General Administrative Policy 5.01.3.2 (which she states provides that the Division Director of Investigations or designee pursues criminal prosecution against an SCDC inmate - not the correctional officer).  Hair Aff., Paras. 5 and 6; see Price Dep. 22-23.

10.  Major Price verbally counseled Bradley about the actions, informing Bradley about the process and asking Bradley to review the policy.  Price Dep. 22-23; see Padula Aff., Bates No. A-213 (Corrective Action for incident on June 23, 2006).

11.  Bradley returned to work at the LCI SMU in July.  See Plaintiff's Dep. 26.[5]

12.  On the morning of July 31, 2006, Bradley was involved in an incident with inmate Livingston which lead to his termination (discussed further below).  The parties do not dispute that Bradley and Sergeant Deborah Walker ("Walker") an African-American female from the Rapid Response Team ("RRT"),[6] were escorting inmates from the showers to their cells, Livingston was handcuffed at all times while being escorted, and as a result of the alleged

---

[5]Plaintiff claims that he filed several complaints of harassment against Padula, Price, and Hair with Robert Ward's office.  He has not, however, given any details or dates as to these complaints (see Plaintiff's Dep. 30, 119-120) and did not assert a claim for harassment in his amended complaint.

[6]The RRT is a collection of SCDC officers primarily responsible for providing crowd control at times of institutional disturbances. Padula Dep. 21-22.  On the day of the alleged incident, the RRT was augmenting the correctional officer staff and working at LCI to show or model correct behavior to correctional officers.  There were concerns at LCI about compliance with SCDC procedures including ensuring that food service ports were secured appropriately and as to the escort, movement, and restraining of inmates.  Sergeant Walker was normally assigned to the Trenton Institution of SCDC, but was working at LCI as a part of the RRT.  Padula Dep. 21-24, 26 and Ex. 3.

incident Livingston sustained shoulder pain and a laceration to his chin requiring sutures. Plaintiff's Dep. 69, 71-72; Plaintiff's Opp. Mem., Ex. 21 (Investigative Activity Report).

13.   In his incident report, Bradley stated that while escorting inmate Livingston back to his cell, Livingston began pulling and jerking away from him, Livingston refused to comply with several directives to stop, Livingston jerked away again, Bradley placed Livingston "on the floor with a leg sweep," Livingston continued to resist, Walker grabbed Livingston's legs, and Livingston was escorted back to his cell without further incident.  Robin Gracien ("Gracien")[7] Dep. Ex. 7 (Investigative File), Bates No. A-144 (Bradley Incident Report).

14.   Sergeant Walker stated that Bradley told Livingston "I got top cop [a chemical munitions spray] today, you all be getting away with a lot of things, but we gonna get this place back in control."  She states she witnessed Bradley push Livingston on the shoulder four times even though Livingston was not resisting Bradley's directives, throw Livingston into a wall and then throw him on the floor, and hold a can of chemical munitions to Livingston's face while Livingston was on the ground.  Gracien Dep., Ex. 7, Bates Nos. A-136-137 (Hair Report), A141-142 (Walker Incident Report).

15.   In his deposition, Bradley testified that Livingston was washing his clothing in the shower (against SCDC policy), so Bradley told Livingston that the shower was finished.  He claims that Livingston told him to stick out his hand so Livingston could hit him like they did that female.[8]  Bradley told Livingston that he was going to gas Livingston, Livingston said "y'all

---

[7]Gracien is the Chief of the Employee Relations Branch of SCDC.

[8]Livingston was apparently referring to a prior incident at LCI during which another inmate slapped a white female guard.

6

have that little MK-4," and Bradley said "no, we have Top Cop now." Bradley states that as he was walking Livingston back to his cell, Livingston jerked away; Livingston tried to run away from him; Walker was leaning on the wall; Walker had the handcuff keys; Walker had the other keys and opened the door for them; and at the time Livingston was struggling on the floor, Walker (who had dropped behind) had to run to help Bradley. Bradley Dep. 70-74.

16.     Later on July 31, 2006, Bradley was assigned to the control room. He allegedly left the control room against SCDC policy and acted in an unprofessional way. Padula issued Bradley a corrective action for leaving a security post and unprofessional conduct. Bradley received a forty-hour suspension without pay and probation for 180 days. Padula Dep., Ex. 5 (Employee Corrective Action).

17.     Bradley claims that no one told him he could not leave the control room, he had to leave the room twice because the other SCDC employees could not handle the situations, and he was properly relieved each time he left the control room. See Plaintiff's Dep. 79-86.

18.     Following the July 31, 2006 incidents, Bradley was reassigned from the SMU to the general inmate population. Padula Aff., Para. 7; see Plaintiff's Dep. 60.[9]

19.     Investigator Hair interviewed Sergeant Walker and reviewed the medical reports of Livingston's injuries. On August 3, 2006, SCDC Investigative Supervisor Terry Taylor requested that the South Carolina Law Enforcement Division ("SLED") conduct an investigation of the incident because it involved alleged misconduct by a SCDC employee. Gracien Dep., Ex. 7, Bates Nos. A-153-155 and A-164-166.

---

[9]Padula did not believe that he could take corrective action against Bradley for the Livingston incident prior to the investigative report being completed. See Padula Dep. 31-32.

20. SLED Special Agent Andrew Bethea was assigned to the investigation and interviewed Bradley, Walker, McBride, and Livingston. On August 30, 2006, Bethea issued an Investigative Report that summarized his interviews and set forth a timeline of events. Gracien Dep., Exs. 5, 6 and 7-Bates Nos. A-157-159, A-177, and A-183.

21. A copy of the report was forwarded to Third Circuit Solicitor Kelly Jackson on September 27, 2006. On October 13, 2006, Solicitor Jackson responded that he would not seek action against Bradley at that time. Gracien Dep., Exs. 5, 6, and 7-Bates No. A-152 (back side). SLED closed its investigation on October 18, 2006. Gracien Dep. Ex. 6.

22. SCDC's Office of the Inspector General received SLED's report on October 21, 2006, conducted its own internal investigation, and completed a report on approximately November 21, 2006. Robert Ward, SCDC Regional Director of Operations, reviewed and approved the report on December 8, 2006. Gracien Dep., Ex. 7, Bates No. A-133.

23. Warden Padula received SCDC's investigative report on December 13, 2006. He reviewed the report to determine if Bradley violated SCDC's applicable policies. Padula drafted a statement concerning Bradley's unnecessary use of force and/or excessive force sometime between receiving the investigative report and prior to Bradley being served with notice of the allegation. Padula Aff., Para. 11; Padula Dep. 28, Ex 4.

24. On January 1, 2007, Bradley wrote to United States Congressman James Clyburn. In his letter, Bradley complained about the August 23, 2006 corrective action (for leaving his post and unprofessional conduct), problems with the grievance and arbitration of his disciplinary action, alleged unfair treatment in the SMU, alleged harassment, and alleged retaliation for his complaints about hiring/promotion practices. Plaintiff's Dep. 97; Gracien Dep., Ex. 8.

25. Congressman Clyburn wrote a letter to SCDC Director Jon Ozmint on January 4, 2007, asking that Bradley's claims be reviewed. Gracien Dep., Ex. 8.

26. On January 10, 2007, South Carolina Senator Kent Williams wrote to Ozmint requesting assistance with problems Bradley experienced at LCI. Plaintiff's Opp. Mem., Ex. 14.[10]

27. On January 17, 2007, Director Ozmint responded to Congressman Clyburn, stating that upon review, Bradley's August 23, 2006 corrective action was not retaliation or discrimination. Gracien Dep., Ex. 9.

28. After reviewing SCDC's investigative report, Warden Padula decided that Bradley's actions constituted unnecessary and/or excessive use of force in violation of SCDC policy. His decision was based on his belief that Walker's version of the events was more credible, Walker was available to assist Bradley with Livingston such that lesser means of control were available, Livingston was handcuffed, Livingston posed no significant threat to anyone's safety, Bradley never felt threatened by Livingston, and Livingston required medical attention. Padula Aff., Paras. 5, 15, 19; Padula Dep. 20-21, Ex. 4.

29. On January 26, 2007, Bradley was placed on administrative suspension without pay pending corrective action for unnecessary and/or excessive use of force. Plaintiff's Opp. Mem., Ex 17 (Padula Memorandum).

30. On January 30, 2007, Gracien wrote a letter to Bradley stating that his employment was terminated effective January 26, 2007. Plaintiff's Opp. Mem., Ex. 18.

---

[10]Bradley's letter is not part of the record.

31. On August 13, 2007, the South Carolina Budget and Control Board reviewed and upheld the recommendation. The South Carolina Administrative Law Court upheld Plaintiff's termination on June 16, 2008. Gracien Aff., Paras. 10-11.

## DISCUSSION

Bradley alleges claims under § 1981 for racial discrimination, claims under § 1983 for violations of his constitutional rights, and a claim under South Carolina law for wrongful termination in violation of public policy. Defendants contend that they are entitled to summary judgment because Bradley: (1) fails to establish a prima facie claim of race discrimination under § 1981; (2) fails to show that his constitutional rights were violated under § 1983; and (3) fails to show that he was wrongfully terminated in violation of public policy.

### A.    § 1981

Bradley alleges that Defendants violated his rights under § 1981 because he was subjected to disparate discipline and wrongfully terminated. Section 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens...." 42 U.S.C. § 1981. The standard for establishing claims of employment discrimination under § 1981 is the same as that under Title VII. See Gairola v. Commonwealth of Virginia Dep't of General Serv., 753 F.2d 1281, 1285-86 (4th Cir.1985). Thus, Bradley's § 1981 claims will be analyzed under the Title VII framework discussed below.

In the absence of direct proof of a defendant's intent to discriminate,[11] a plaintiff can employ the scheme outlined in <u>McDonnell Douglas v. Green</u>, 411 U.S. 792 (1973) to establish a prima facie case of discrimination. <u>McDonnell Douglas</u> provides that, once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory basis for the challenged employment action. <u>McDonnell Douglas</u>, 411 U.S. at 802. If the employer provides the required evidence of a non-discriminatory reason for the action, the plaintiff must then show that the proffered reasons were not the true reasons for the employment action, but were a pretext for discrimination. <u>Id.</u> at 804; <u>see also</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 147 (2000).

### (1)      Wrongful Termination

Bradley alleges that he was wrongfully terminated based on his race. Defendants contend that Bradley fails to establish his prima facie case; they have articulated a legitimate, nondiscriminatory reason for his termination; and Bradley fails to show that this reason is pretext for discrimination.

### (a)      Prima Facie Case

Under the <u>McDonnell Douglas</u> framework, an employee can establish a prima facie case by showing that:

(1)       he is a member of a protected class;

(2)       he suffered an adverse employment action;

(3)       he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and

---

[11]Bradley admits that he does not have any direct evidence of discrimination. <u>See</u> Plaintiff's Opp. Mem. at 18.

(4)     the position was filled by a similarly qualified applicant outside the protected class or other employees who are not members of the protected class were retained under apparently similar circumstances.

See Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007), cert. denied, __ U.S. __, 128 S.Ct. 955 (2008); Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir. 2004).

The parties do not dispute that Bradley is a member of a protected class and that he was subjected to an adverse employment action (termination).  Defendants appear to argue that Bradley has not established his prima facie case because he has not shown that he met the fourth prong of his prima facie case.

Bradley fails to establish a prima facie case of wrongful termination because he has not shown that he was replaced by someone outside the protected class or that other employees who are not members of the protected class were retained under apparently similar circumstances.  He has not identified a similarly-situated employee outside of the protected class who engaged in similar misconduct and was not terminated.

### (b)     Legitimate, Nondiscriminatory Reason/Pretext

Even if Bradley could establish a prima facie case, Defendants have articulated a legitimate, nondiscriminatory reason for terminating Bradley, that Bradley violated SCDC policy as to the use of force in the incident involving inmate Livingston.  Warden Padula specifically found that Bradley's use of force was excessive because (during the incident) inmate Livingston was handcuffed, Livingston was generally compliant and cooperative, and Livingston posed no significant threat to Bradley's or anyone else's safety.  Padula Dep., Ex. 4.  Padula testified that the issue with Bradley's actions included that he brought down an inmate who was in handcuffs and he did not control the inmate's fall.  The Warden stated:

> We teach a variety of techniques and defensive tactics that are designed to get the inmate to comply to our efforts to place him on the floor. We don't teach kicking legs out from handcuffed inmates and letting them fall.

Padula Dep. 33.

Bradley argues that he has shown pretext because he believes the facts could support a finding that he did not violate the use of force policy. He also argues that the technique used to take down inmate Livingston was taught to him in a training class and he was not disciplined when he previously used the technique. Plaintiff's Opp. Mem. at 21.

Bradley fails to show pretext. Although Bradley claims that he did not use unnecessary or excessive force against inmate Livingston, Padula based his decision on SCDC's investigative report which included statements from Bradley, Sergeant Walker,[12] and inmate Livingston. Bradley fails to show that this reason is false or was pretext for discrimination.

Although he argues that he was taught the "leg sweep" maneuver in training and previously used it, he has presented nothing to dispute Warden Padula's assertion that even if defensive moves are used, a correctional officer is required to guard the inmate's fall. Even if Bradley's conduct did not constitute unnecessary and/or excessive use of force, he fails to show pretext as he has not shown that the decisionmaker (Padula) did not have a reasonable belief that Bradley's conduct constituted unnecessary and/or excessive force. See Holland v. Washington Home, Inc., 487 F.3d at 217 (in assessing pretext, a court's focus is on the perception of the decisionmaker, that is, whether the employer believed its stated reason was credible); see also Jones v. Giant Foods, Inc., 2000 WL 1835393 (D.Md. Nov. 27, 2000)(unpublished)(Jones argued that Giant's proffered reason for firing

---

[12]Bradley appears to argue that Padula should have accepted his version of the facts over those of Sergeant Walker (African-American female) He has not shown, however, that Warden Padula's decision was based on Bradley's race.

her, that she had stolen two cans of soup, was pretextual because she did not, in fact, steal the soup. "What matters in the Title VII analysis, however, is not whether Jones stole two cans of soup, but whether Giant in good faith believed she did.").

Bradley also appears to argue that the reason for his termination was pretextual because SLED found that he had not committed a crime. This fails to recognize that Bradley's termination was based on a violation of SCDC policy, not the commission of a crime. Further, SLED's investigative report did not provide an opinion or conclusion about Bradley's conduct. See Padula Aff., Para. 9 and Gracien Dep., Ex. 6 (SLED Case File).

Bradley may be attempting to argue that the time gap between his misconduct in July 2006 and his termination in January 2007 is evidence of pretext. Padula, however, testified that the time was used to investigate the incident. Padula Aff., Para. 10; Padula Dep. 31-32.

### (2) Disparate Discipline

Bradley appears to allege that he was subjected to disparate discipline because white correctional officers were disciplined less severely for similar offenses. Defendants contend that Bradley fails to establish a prima facie case of disparate discipline and fails to show pretext.

### (a) Prima Facie Case

To establish a prima facie case of disparate discipline, a plaintiff must show "(1) that plaintiff engaged in prohibited conduct similar to that of a person of another race, color, sex, religion, or national origin, and (2) that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person." Lightner v. City of Wilmington, N.C., 545 F.3d 260 (4th Cir. 2008), citing Moore v. City of Charlotte, 754 F.2d 1100, 1105-06 (4th Cir. 1985) (adapting the McDonnell Douglas framework for the employee discipline context).

Bradley fails to establish a prima facie case of disparate discipline because he has not shown that he was disciplined more harshly than similarly-situated SCDC employees of another race. He did not identify his comparators in his amended complaint or opposition memorandum.[13] Defendants provide that Plaintiff did not identify any similarly-situated white officers in his responses to their interrogatories. <u>See</u> Defendants' Motion for Summary Judgment, Ex. M. They note that, in his deposition, Bradley identified four possible comparators:

(1) Sergeant Gerald; 2006; inmate took her handcuff keys and she did not report it (Plaintiff's Dep. 107-108);

(2) Officer Borgersrode; 2006; opened a door and inmate attacked another officer (Plaintiff's Dep. 109-111);

(3) Officer (name unknown); occurred after Plaintiff's termination; let inmate make copy of his key (Plaintiff's Dep. 111-112); and

(4) Officer Grate; occurred after Plaintiff's termination; opened a door and inmate came out and stabbed another inmate (Plaintiff's Dep. 106-107).

Bradley fails to establish a prima facie case as to Sergeant Gerald, Sergeant Borgersrode, or the unknown officer because he has presented no evidence to support his claim. Warden Padula states that there is no record of a "Sergeant Gerald" ever working at LCI, nor any record of an incident as described by Bradley by a different correctional officer; there is no record of an incident regarding Sergeant Borgersrode as described by Plaintiff; and there is no record of an incident of any officer letting an inmate make a copy of a key. Padula Aff., Para. 20.

---

[13]In his opposition memorandum, Bradley left the prima facie section of his disparate discipline argument blank, but states in the prima facie section of his wrongful termination argument that he "has sited [sic] to separate incidents involving white individuals compared to the Plaintiff. As set forth in the Plaintiff's affidavit the Plaintiff was subjected to harsher discipline." Plaintiff's Opp. Mem. at 22. Bradley's opposition memorandum and affidavit, however, do not identify any officers outside the protected class who engaged in comparable prohibited conduct and were disciplined less severely.

Bradley also fails to establish a prima facie case with regard to Officer Grate because he fails to show that they were similarly situated. In September 2007, Officer Grate was returning a restrained inmate to his cell and could not remove the handcuffs through the cuffing port in the cell door because of a malfunction with the port. Officer Grate opened the cell doors to remove the cuffs, at which time the inmate pushed past him and punched another inmate worker. Officer Grate received a written corrective action for the incident. Padula Aff., Para. 22. Bradley appears to complain that he was more harshly disciplined than white officers for the incident regarding inmate Livingston and for leaving his post. Neither of these incidents, however, are similarly serious to the incident with Officer Grate. See Lightner, 454 F.3d at 265 ("similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful"). Warden Padula states that Officer Grate's actions, while negligent, were not as serious as Bradley's actions because Grate attempted to follow SCDC policy, but could not, due to a malfunction with the cuffing port. Padula Aff., Para. 21.

### (b) Legitimate, Nondiscriminatory Reason/Pretext

Even if Bradley could establish a prima facie case of disparate discipline, Defendants have articulated legitimate, nondiscriminatory reasons for their disciplinary actions. As discussed above, Defendants articulated that Bradley was terminated for violating SCDC policy. He was disciplined for leaving a security post and unprofessional conduct in violation of SCDC policy based on reports that Bradley violated a direct order not to exit the SMU control room and exhibited unprofessional conduct (argumentative and rude with Corporal Curtis and seeming more interested

in punishing inmate Johnson - who had flooded his cell - than addressing the flooding situation by turning off the water). See Padula Aff., Para. 6.[14]

Bradley argues that he has shown pretext for the same reasons discussed with regard to his discriminatory termination claim. As discussed above, Bradley fails to show that these reasons are false or pretextual.

**B.  § 1983**

In his amended complaint, Bradley alleges that Defendants violated his rights under § 1983 because they instituted and pursued false charges against him, falsely accused him of a crime, and maliciously pursued his termination.[15]  Amended Complaint at 5.  Defendants contend that they are entitled to Eleventh Amendment immunity and are not "persons" within the meaning of § 1983, Bradley cannot demonstrate that he was deprived of a property or liberty interest, and the individual Defendants are entitled to qualified immunity.[16]

---

[14]Bradley claims he received additional disciplinary write-ups in September for reading an inmate's mail and taking inmates to the wrong bus station in Florence.  Plaintiff's Opp. Mem. at 52. He has presented no evidence to show that he received any adverse disciplinary action as to these incidents.  Padula submitted a copy of a corrective action concerning the mail incident which indicates that no disciplinary action was imposed.  Attachment (Bates No. A-207) to Padula Aff.

[15]To the extent that Bradley is attempting to assert a claim for malicious prosecution, such a claim fails.  There is no independent cause of action for malicious prosecution under § 1983.  To prevail on a Fourth Amendment malicious prosecution claim under § 1983, a plaintiff must show that: (1) the defendant initiated or maintained a criminal proceeding; (2) the criminal proceeding terminated in the plaintiff's favor; (3) the proceeding was not supported by probable cause; and (4) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.  See Id. at 260-262 (4th Cir. 2000)(observing that a "malicious prosecution" claim under § 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates the common law malicious prosecution tort elements except for malice).  Here, Bradley has not shown that Defendants initiated or maintained a criminal proceeding or that he suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

[16]The individual defendants are entitled to qualified immunity, as Bradley fails to show (as
(continued...)

**(1)     Eleventh Amendment Immunity**

Defendants contend that they are entitled to Eleventh Amendment immunity and/or are not persons under § 1983.  Bradley argues that Defendants are not entitled to Eleventh Amendment immunity, but provides nothing to support this assertion.  <u>See</u> Plaintiff's Opp. Mem. at 24-25.

When a defendant is sued in his or her official capacity, the suit is frequently intended as one against the state, the real party in interest.  If review of the pleadings indicates that the state is, in fact, the party being sued, then a judgment awarding damages is precluded by the Eleventh Amendment of the United States Constitution.  Although declaratory and/or injunctive relief may be granted, damages may not be awarded against the state.  In the case of <u>Will v. Michigan Department of State Police</u>, 491 U.S. 58 (1989), the Supreme Court analyzed the interplay between § 1983 and the Eleventh Amendment of the Constitution and stated:

> Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties.  The Eleventh Amendment bars such suits unless the State has waived its immunity [cites omitted] or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity.

<u>Id.</u> at 66.

The Eleventh Amendment immunity granted to the states "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes," but

---

[16](...continued)
discussed further below) that they violated any of his clearly established statutory or constitutional rights.  <u>See</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982)

the court found that state agencies, divisions, departments, and officials are entitled to Eleventh Amendment immunity. Id. at 70. In reaching this conclusion, the court held that a suit against state officials acting in their official capacities is actually against the office itself and, therefore, against the state. State officials may only be sued in their individual capacities. Therefore, SCDC and Ozmint, Price and Padula in their official capacities are entitled to Eleventh Amendment immunity from monetary damages.

### (2)    <u>Protected Property or Liberty Interest</u>

Defendants contend that Bradley cannot establish a § 1983 claim because he has not shown that he was deprived of a property or liberty interest. A public employee cannot invoke the procedural protections of the Due Process Clause unless the aggrieved employee can establish that he has been deprived of a liberty or property interest protected by the clause. <u>Board of Regents v. Roth</u>, 408 U.S. 564, 569-70 (1972); <u>Royster v. Board of Trustees</u>, 774 F.2d 618, 620 (4th Cir.1985), <u>cert. denied</u>, 475 U.S. 1121 (1986). Unless an employee satisfies this threshold requirement, the Due Process Clause is not implicated by the discharge. <u>Royster</u>, 774 F.2d at 621; <u>Bunting v. City of Columbia</u>, 639 F.2d 1090, 1093-94 (4th Cir. 1981).

### (a)    <u>Property Interest</u>

Defendants contend that Bradley fails to show that he had a property interest in employment at SCDC because he was an at-will employee at all times. Bradley has not shown that he had a protected property interest in his employment with SCDC because he fails to show that his employment was not at-will. He argues that he was not an at-will employee because he believed that he could only be terminated for cause. Bradley has submitted nothing to support his assertion other than his own unsigned, unnotarized statement in which he states that he thought he was not an at-will

employee.  See Plaintiff's Opp. Mem., Ex. 1.  Further, he has not presented anything to show that Defendants contractually altered the at-will employment relationship.[17]

**(b)      Liberty Interest - First Amendment Protected Speech Claim**

Defendants contend that Bradley fails to show that he was denied a liberty interest in employment without due process as to an alleged termination in retaliation for the exercise of his First Amendment rights.  Specifically, Defendants argue that Bradley fails to show that he engaged in protected speech on a matter of public concern or that there was a causal relationship between the protected speech and his termination.

It is well settled that citizens do not relinquish all of their First Amendment rights by virtue of accepting public employment. See United States v. National Treasury Employees Union, 513 U.S. 454, 465 (1995); Connick v. Myers, 461 U.S. 138, 142 (1983); Pickering v. Board of Educ., 391 U.S. 563, 568 (1968).  The United States Supreme Court held in Pickering that a government employee may exercise his right to speak as a citizen on issues of public importance as long as the employee's interest in exercising free speech is not outweighed by the countervailing interest of the government employer in providing the public service the employee was hired to provide. "The First Amendment protects public employees from termination of their employment in retaliation for their exercise of speech on matters of public concern."  McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998).  To

_____

[17]Under South Carolina law "[a]t-will employment is generally terminable by either party at any time, for any reason or for no reason at all."  Prescott v. Farmers Tel. Coop., Inc., 335 S.C. 330, 516 S.E.2d 923, 925 (1999). South Carolina recognizes only three exceptions to this general rule: (1) an employee has recourse against his employer for termination in violation of public policy; (2) an at-will employee may not be terminated for exercising constitutional rights; and (3) an employee has a cause of action against an employer who contractually alters the at-will relationship and terminates the employee in violation of the contract.  Nelson v. Charleston County Parks & Recreation Comm'n, 605 S.E.2d 744, 746 (S.C.Ct.App. 2004).

establish a claim for deprivation of First Amendment rights flowing from an adverse action, a public employee must establish:

(1) that he engaged in protected speech regarding a matter of public concern;

(2) his interest in First Amendment expression outweighed his employer's interest in efficient operation of the workplace;

(3) he was deprived of some valuable benefit; and

(4) a causal relationship between the protected expression and the adverse action.

See Peters v. Jenney, 327 F.3d 307, 322 (4th Cir. 2003); Goldstein v. Chesnut Ridge Volunteer Fire Co., 218 F.3d 337 (4th Cir. 2000), cert. denied, 531 U.S. 1126 (2001). "The inquiry into the protected status of speech is one of law, not fact." Connick, 461 at 148 n. 7.

Bradley fails to establish that his First Amendment rights were violated because he has not shown that his speech was a matter of public concern. He wrote a letter to Congressman Clyburn concerning the upholding of his August 2006 suspension, alleged harassment after he tried to have inmate McGahee prosecuted in May 2006, and alleged misconduct by other correctional officers.[18] "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." Urofsky v. Gilmore, 216 F.3d 401, 406-407 (4th Cir. 2000); see Connick v. Myers, 461 at 146. Bradley's complaints, which were related to matters of personal concerns and matters of internal agency administration and policy, were not protected speech. See Dennison v. County of Frederick, 921 F.2d 50, 54 (4th Cir. 1990)(employee's complaints regarding enforcement of building code not public speech); Urofsky, 216 F.3d at 427 (public speech not entitled to

---

[18]He may also be alleging that SCDC retaliated against him for making calls to headquarters and the South Carolina Human Affairs Commission, but fails to provide any details of these alleged calls (e.g. dates and names). See Plaintiff's Opp. Mem., Ex. 11; see also Plaintiff's Dep. 30, 86-87, 112-115, 119-120, 129.

protection if it is purely a personal concern to employee such as a private personnel grievance); Edwards v. City of Goldsboro, 178 F.3d 246 (4th Cir. 1999)(personal grievances do not constitute speech about matters of public concern). When a public employee speaks primarily in his role as an employee rather than in his role as a private citizen, his speech is not constitutionally protected. See Urofsky, 216 F.3d at 407-408; DiMeglio v. Haines, 45 F.3d 790, 805 (4th Cir. 1995). Review of Bradley's letter to Congressman Clyburn indicates that Bradley was primarily speaking as an employee with a concern about personnel issues taken against him, rather than as a private citizen.

Bradley also fails to establish a causal connection between his letter to Congressman Clyburn and his termination. The causation requirement is "rigorous" and Bradley is required to establish that "but for" the protected speech, the adverse action would not have been taken. Huang v. Board of Governors of the Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir. 1990). Warden Padula, the terminating official, testified that he had no knowledge of Bradley's letter to Congressman Clyburn prior to making his decision ( Padula Dep. 32; see also Padula Aff., Para. 18). In his opposition memorandum, Bradley cites his own affidavit to support his argument that he has shown that Padula knew of the letter prior to his termination. In his affidavit, Bradley states that in his termination meeting with Padula he informed Padula that his termination was in retaliation for his letter to Congressman Clyburn to which Padula responded "the letter doesn't matter." Plaintiff's Opp. Mem. 13, Ex. 1. Bradley's affidavit, however, is unsigned and unnotarized. See Fed. R. Civ. P. 56(e)(1)("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.") Further, there is no indication that Bradley previously claimed that Warden Padula knew of the letter prior to his termination or that he accused Padula of retaliation during the termination

meeting. During his deposition, Bradley was questioned about his letter to Congressman Clyburn and specifically asked what evidence he had to support his belief that he was terminated because of the letter. In response, Bradley never cited any alleged acknowledgment of the letter by Warden Padula or that Bradley allegedly accused Padula of retaliation at the meeting. See Plaintiff's Dep. 113-120. Additionally, Bradley cannot demonstrate the causation requirement because the evidence in the record indicates that he would have been terminated for his violation of SCDC policy regardless of any alleged protected speech.

### C. Wrongful Termination in Violation of Public Policy

Bradley alleges that he was wrongfully terminated in violation of public policy. He claims that he was terminated in retaliation for reporting violations of public policy to Congressman Clyburn and State Senator Williams. Defendants contend that the public policy exception, which applies only when an employer requires an employee to violate a criminal law (or else face termination) or where the reason for the employee's termination itself violates criminal law, does not apply to Bradley's situation.

"Where the retaliatory discharge of an at-will employee constitutes violation of a clear mandate of public policy, a cause of action in tort for wrongful discharge arises." Ludwick v. This Minute of Carolina, Inc., 337 S.E.2d 213, 216 (S.C. 1985). In Ludwick, the employee was discharged from her employment because she chose to testify before the South Carolina Employment Security Commission (and avoid criminal penalties for failing to testify) pursuant to a subpoena. Id. at 214, 216. The Fourth Circuit has stated that the Ludwick exception is to be narrowly applied. Merck v. Advanced Drainage Systems, 921 F.2d 549, 554 (4th Cir. 1990). The South Carolina Supreme Court has only recognized public policy claims in cases where an employer forced an

employee to violate the law such as in <u>Ludwick</u>, or the termination itself was a violation of criminal law such as in <u>Culler v. Blue Ridge Elec. Coop., Inc.</u>, 422 S.E.2d 91 (S.C. 1992). Additionally, in <u>Epps v. Clarendon County</u>, 405 S.E.2d 386 (S.C. 1991), the Supreme Court of South Carolina declined to extend the public policy exception of <u>Ludwick</u> where an employee already had "an existing remedy for a discharge [Epp's claim that he had been terminated in violation of his constitutional right to free speech and association was actionable under 42 U.S.C. § 1983] which allegedly violates rights other than the right of employment itself." <u>Id</u> at 387, <u>see</u> <u>also</u> <u>Lawson v. South Carolina Dep't of Corrs.</u>, 532 S.E.2d 259, 261 (S.C. 2000)(where statute creates a substantive right and provides a remedy for infringement of that right, the plaintiff is limited to that statutory right); <u>Dockins v. Ingles Markets, Inc.</u>, 413 S.E.2d 18, 19 (S.C. 1992).

Here, Bradley fails to show that the public policy theory should apply because he has not shown that SCDC forced him to violate the law or that his termination itself was in violation of criminal law. Further, Bradley has an existing remedy for his discharge (a claim under § 1981, § 1983, or Title VII for retaliation).

### <u>CONCLUSION</u>

Based on the foregoing, it is recommended that Defendants' motion for summary judgment (Doc. 33) be **granted**.

Joseph R. McCrorey
United States Magistrate Judge

January 14, 2010
Columbia, South Carolina